U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
F I L E D
NOV 1 6 2004
ROBERT H. SHEMWELL, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| HEATHER LEHMAN, ET AL | : | DOCKET NO. 03 CV 1432 |
| VS. | : | JUDGE MINALDI |
| CHERYL LEICHLITER AND CITY OF LAKE CHARLES | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

### Summary

The plaintiffs filed suit pursuant to 42 U.S.C. Sections 1983 and 1988, the United States Constitution, and Louisiana Civil Code Article 2315 after their immediate family member, William Lehman, was shot to death by Lake Charles City Police Officer Cheryl Leichliter while she was on duty. The defendants argue that Mr. Lehman's constitutional rights were not violated, and that if they were, they are entitled to qualified immunity. The defendants also argue that the City of Lake Charles is not liable. For the reasons provided, the Motion for Summary Judgment is DENIED with respect to Leichliter and GRANTED with respect to the City of Lake Charles.

### Procedural history

This petition was filed on July 30, 2003 in the 14th Judicial District Court of Louisiana. The case was removed on August 5, 2003, and discovery has been ongoing. Pursuant to Magistrate Judge Wilson's September 8, 2004 order, the dispositive motion deadlines were

extended to allow the late filing now under consideration. The defendants filed the instant Motion for Summary Judgment [doc.#28] on October 1, and the plaintiffs have opposed it. A jury trial is set for October 25, 2004.

## **Summary judgment standard**

The Supreme Court has interpreted the standards which should be applied in considering the entry of summary judgment. The Court has stated that Fed.R.Civ.P. 56(c) mandates summary judgment in any case where a party fails to establish the existence of an element essential to his case on which he bears the burden of proof, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d. 265 (1986).

A complete failure of proof on an essential element renders all other facts immaterial because there is no longer a genuine issue of material fact. *Id.* Rule 56(c) requires the district court to enter summary judgment if the evidence favoring the nonmoving party is not sufficient for the jury to enter a verdict in his favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d. 202 (1986).

When the moving party has carried his burden under Rule 56(c), his opponent must present more than metaphysical doubt about the material facts, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d. 538 (1986). A claim that further discovery or a trial might reveal facts, of which the plaintiff is currently unaware is insufficient to defeat the motion, *Woods v. Federal Home Loan Bank Bd.*, 826 F.2d. 1400, 1414-15 (5th Cir. 1987), *Washington v. Armstrong World Industries, Inc.*, 839 F.2d.1121 (5th Cir. 1988).

## Analysis

**Background**

Officer Cheryl Leichliter responded to a dispatch call about a disturbance in the Madrid apartment complex on Second Avenue on the night of June 24, 2002. She was erroneously advised by the dispatcher that shots had been fired in connection with the disturbance.[1] When she arrived, she encountered Ben Ladner, who had helped Heather Lehman[2] drive William Lehman home that evening and had contacted the police with Heather Lehman after the two witnessed William Lehman behave erratically.[3] Ben Ladner informed Leichliter that William Lehman was intoxicated and unarmed but suggested that she ready her pepper spray as a precaution.

When Leichliter encountered William Lehman, the disoriented man began running towards her making unintelligible sounds. Leichliter alleges that William Lehman was 30 or 40 feet from her when he began running, that she warned him to stop, was forced to retreat as he ran towards her and that he never turned away from her.[4] Leichliter testified that she thought she saw him move his hand in a threatening way, as if to reach for a weapon, and she shot at him three

---

[1] Liechliter deposition, p. 52.

[2] Heather Lehman is the sister of the decedent, William Lehman. She married Ben Ladner during the pendency of litigation and will be referred to by her maiden name.

[3] Heather Lehman and Ben Ladner called the police to help subdue William Lehman. They monitored him until the police arrived and, at all times, were concerned for his welfare and safety.

[4] Leichliter deposition, p. 56 and p. 58. "– he would not stop. He would not – he would not comply with me telling him to stop. Even when I pulled the gun and told him to stop, he did not stop."

times when he was only three or four feet away.[5] Leichliter's first bullet hit a truck. Her second and third bullets struck William Lehman in the back. He died three months later from the wounds.

Heather Lehman and Ladner provide a starkly different account. Heather Lehman testified that once William Lehman ran towards Leichliter, the officer never provided a warning or said anything and "just pulled out her gun and then shot and looked very panicked."

Ladner supported this version of events when he testified that Leichliter pulled out her gun and fired the first shot after William Lehman had run approximately half of the 80 foot distance that separated them. Ladner testified that William Lehman changed direction after the first shot so that he was no longer running toward the officer, but that Leichliter, nonetheless, fired two shots into him and in the vicinity of Heather Lehman, who was following her brother and trying to subdue him. After firing the shots, Ladner testified that Leichliter remained silent and in place until another officer arrived and pulled her gun down.[6] The autopsy report supports the plaintiffs' version of the story, as it establishes that William Lehman was shot twice in the back. For purposes of summary judgement, the court is obligated to resolve any facts in dispute in favor of the non-moving party.

---

[5] Leichliner deposition, pp. 59 and 69. Leichliner says that she was running backward and suggests that it is possible for her to have fired the first shot from a distance of three or four feet and still have time to fire two more shots into a man running full-speed toward her. She also suggests that it is possible for her to have missed the first shot even though it was taken from a distance of only a few feet.

[6] Leichliter disputes this account in her deposition, p. 84. Ladner and Heather Lehman allege that Leichliter refused to allow them to aid the victim after he was shot.

**There is a genuine issue of material fact as to whether Officer Leichliter violated William Lehman's constitutional rights.**

The defendants' first argument is that Leichliter was authorized to use force against William Lehman because her actions were objectively reasonable under the Fourth Amendment. The evidence in the record does not support this conclusion.

The United States Supreme Court has ruled that Section 1983 claims are evaluated under the Fourth Amendment's standard of reasonableness.[7] In deciding whether force used by an officer is reasonable, courts are required to judge the totality of the facts and circumstances from the perspective of a reasonable officer on the scene and should not evaluate the officer's actions with the benefit of 20/20 hindsight. This calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments about the use of force under circumstances that are tense, uncertain, and rapidly evolving.[8] District courts look to factors such as whether the suspect was accused of a severe crime, whether he posed an immediate threat to the safety of officers, and whether he was actively resisting arrest or attempting to evade arrest by flight.[9]

In *Tennessee vs. Gardner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court explained that an officer is entitled to use deadly force to prevent escape when the officer has probable cause to believe that the suspect poses a threat of serious physical harm. However, the Supreme Court also ruled in *Gardner* that a Tennessee statute was unconstitutional because it

---

[7] *Graham vs. Conner*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

[8] *Huong vs. City of Port Arthur*, E.D. Tex. 1997, 961 F.Supp. 1003, *Graham vs. Conner*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed2d 443 (1989).

[9] *Huong vs. City of Port Arthur*, E.D. Tex. 1997, 961 F.Supp. 1003.

allowed officers to use deadly force against unarmed suspects who posed no immediate threat of physical harm. Specifically, the court ruled that an officer was not justified in firing upon an unarmed man fleeing to evade arrest after being caught in the midst of a nighttime burglary.

Leichliter claims that her concern was more immediate than the threat of escape– she asserts that she feared for her own safety.[10] However, as stated, that fear must be based on the fear that would be experienced by a reasonable officer on the scene.

Leichliter articulated three things in her testimony which led her to believe that William Lehman posed a threat of serious harm. First, she observed him running toward her[11] and shouting[12] for no apparent reason. Second, she was advised by the police dispatcher that shots may have been fired prior to her arrival.[13] Third, she says that she believed William Lehman was reaching as if to retrieve a weapon from his pants, or that he might take her weapon if he reached her.[14]

---

[10] "I didn't know if he had a gun or not. And even if he didn't, I was not going to let him get his hands on me, beat the crap out of me, take my gun and shoot – shoot me and shoot the officers and anybody else around." Leichliter deposition, p. 58.

[11] The speed of William Lehman's charge toward Leichliter is in dispute. For summary judgment purposes, the court is obligated to resolve facts in dispute in favor of the non-moving party. In this case, Ladner admits that William Lehman was running at a high speed, although he says that Lehman did so facing forward, as if he was going to fall.

[12] Leichliter describes William Lehman as ". . . screaming the whole time, which was like a battle cry." Leichliter deposition, p. 92. The plaintiffs acknowledge that William Lehman was making unintelligible noises as he ran.

[13] The defendants have produced no evidence, other than Leichliter's testimony, that the dispatcher advised her that shots were fired.

[14] This is disputed by the other witnesses on the scene, who say that William Lehman never made a move which could be mistaken as reaching for a weapon.

Leichliter justifies her decision not to use pepper spray because: (1) she believed that she was about to be confronted with deadly force; (2) William Lehman was out of the pepper spray's effective range;[15] (3) she was not confident that she could get a clear shot of spray into William Lehman's eyes as he ran; and (4) in her experience, pepper spray does not work on people in an aggressive state.[16] Likewise, Leichliter did not believe that other methods of non-lethal force, such as hand control blows, a baton, or Taser, would have been effective.[17]

The plaintiffs dispute Leichliter's version of the facts and argue that Leichliter should have used non-lethal rather than deadly force because she was told that William Lehman was unarmed[18] and she never actually saw him with a weapon.[19] Leichliter's decision to use deadly force was premised upon her conclusion that William Lehman posed an immediate threat to her safety. The undisputed facts do not support this conclusion.

First, there is a dispute of material fact as to whether Leichliter ordered William Lehman to stop or gave him any additional instructions prior to using deadly force.[20] This is significant,

---

[15] Leichliter testified that the effective range of her pepper spray was 15 feet. However, she also testified that he was only three to four feet from her when she first fired.

[16] Leichliter deposition, pp. 41-44.

[17] Leichliter deposition, p. 96-97.

[18] See Ben Ladner's deposition, p. 35, "I told her that he was drunk and he was unarmed, to use pepper spray." See also Leichliter deposition, p. 50. See also, Leichliter's claim that she could not hear Ladner, Leichliter deposition, p. 71-72.

[19] Leichliter deposition, p. 50.

[20] Leichliter testified in her deposition that she gave instructions but that William Lehman ignored them. The other two witnesses on the scene testified that she did not say anything prior to firing.

since a jury could conclude that firing upon an unarmed man three times without first instructing him to stop is an unreasonable use of deadly force.

Second, the plaintiffs have questioned the quality of Leichliter's eyesight. The plaintiffs attach medical records which establish that during a mandated eye exam several years ago, Leichliter was instructed to wear stronger glasses and informed that she suffers from reduced depth perception.[21] Leichliter testified that she does not require glasses, which leads a reasonable person to conclude that she was not wearing any on the night of the shooting. A jury could conclude that it is unreasonable for an officer to show up for duty without proper glasses and then fire a deadly weapon in an apartment complex at a suspect she could not properly see.

Third, Melvin Tucker, the former Chief of Police of Tallahassee, Florida, testified as an expert witness that Leichliter failed to follow accepted law enforcement protocol because she did not wait for backup officers before confronting William Lehman.[22] In reviewing the dispatch records, Tucker determined that Liechliter would only have had to wait two minutes and 58 seconds for backup to arrive. This is especially important since Leichliter claims to have been told that shots were fired.

Fourth, even if Leichliter had the right to use deadly force, that right ended when the perceived threat ended. The defendants attached the Lake Charles Police Department's Use of Force guidelines, dated August 21, 2000.[23] Lethal force is the fifth of five levels of force

---

[21] Plaintiff Exhibit "A". The Eye Clinic Report of Consultation signed by Dr. J.E. Sorrells, Jr., reads, "Needs stronger glasses. Does not have binocular depth perception because of lazy eye."

[22] Plaintiff Exhibit "X", p. 6.

[23] Defense Exhibit "D".

available to officers and may be used when the officer, "reasonably believes that such force is necessary to protect himself or others from a significant and immediate threat of death or serious physical injury."[24]

The guidelines further provide that, "Once resistance is overcome or aggression is reduced, the officer must correspondingly and immediately reduce the degree of force he is applying, or the use of force is not legal."[25] The plaintiffs' testimony and the autopsy report create a genuine issue of material fact that any resistence by William Lehman was quickly overcome when William Lehman turned away from Leichliter some time prior to her shooting him. Under the defendants' own standards, the evidence suggests that Leichliter was unreasonable in her use of deadly force. At a minimum, this evidence creates a genuine issue of material fact as to the reasonableness of Leichliter's use of force.

**Leichliter is not entitled to the defense of qualified immunity**

The defendants also assert the defense of qualified immunity. Qualified immunity protects government employees performing discretionary functions from liability, so long as they reasonably believe that they are acting within their rights.[26] Once it is determined that a plaintiff's rights have been violated and that those rights were clearly established under the law at the time of violation, an officer may assert a defense of qualified immunity if he or she can show that the action taken was objectionably reasonable in light of the legal rules clearly established at

---

[24] Defendants' Exhibit "D", Section III (d)(1).

[25] Defendants' Exhibit "D", Section III (b)(2).

[26] *Harlow vs. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

the time of the incident.[27] As discussed, there is a genuine issue of material fact as to whether Leichliter's actions violated William Lehman's clearly established constitutional right to be free from unreasonable harm by the police, leaving only the question of whether Leichliter, as a reasonably competent law enforcement officer, would have known that her actions violated clearly established law.[28]

When a jury views the facts from the perspective of a reasonable officer, it could easily conclude that Leichliter was aware or should have been aware that her thrice use of deadly force against an unarmed, retreating man was in violation of clearly established law. Therefore, there is a genuine issue of material fact as to whether Leichliter was reasonable in her use of force, and Liechliter is not entitled to summary judgment on the defense of qualified immunity.

**The City of Lake Charles is not entitled to summary judgment**

The plaintiffs allege that the City of Lake Charles is liable for creating a policy or custom which led to William Lehman's death. The burden for proving such a case is to show (1) the training procedures of the municipality's policy maker are inadequate; (2) the municipality's policy maker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused the plaintiff's injury.[29]

The Lake Charles Police Department's policy on the use of force has already been discussed. It requires that force be used only as a last resort in order to protect life and that the

---

[27] *Id.*

[28] *Jackson vs. Beaumont Police Department*, 958 F.2d 616, 620 (5th Cir. 1992).

[29] *City of Canton, Ohio vs. Harrah's*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

use of force be limited when a threat no longer exists. The department is accredited by the Commission on Accreditation of Law Enforcement Agencies, Inc.[30] and requires that its officers be trained and certified under the Louisiana Peace Officers Standards and Training.

However, the City's stated training requirements and its stated policies on the use of deadly force do not assure that Leichliter received proper training or was in a proper position to act as a reasonable officer on the night of the shooting.

First, it has already been determined that there is a genuine issue of material fact as to whether Leichliter violated William Lehman's rights. The City asserts that Leichliter was trained to shoot when faced with her circumstances and that she was justified in doing so.[31] If a jury were to conclude that Leichliter violated William Lehman's rights while acting in accordance with her training, it would be logically compelled to conclude that the City's training bears some responsibility for William Lehman's death. This creates a genuine issue of material fact as to whether the City's training was knowingly inadequate and whether the inadequate training led to the plaintiffs' damages.

Second, the undisputed evidence establishes that Leichliter has vision problems which were not corrected on the night of the accident. The City was aware of these vision problems because it ordered Leichliter to undergo an eye exam after she wrecked three police cars within a short period of time. When that exam determined that Leichliter needed stronger glasses and had difficulty with depth perception, the City did nothing to assure Leichliter's compliance with the doctor's orders. The City continued to employ, arm, and place her in the line of duty. Because

---

[30] Defendants' Exhibit "D", paragraph 2.

[31] *See* the testimony of Frank Adams.

of the dangerous duties of police officers and the split-second decisions that they must make about using deadly force, it is incumbent upon departments to ensure the fitness of their officers. A jury could reasonably conclude that this failure to assure Leichliter's fitness for duty was a contributing factor in William Lehman's death, and, therefore, a genuine issue of material fact exists.

Therefore, the defendants' Motion for Summary Judgment [doc.#28] will be DENIED.

Lake Charles, Louisiana, this 16 day of November, 2004.

PATRICIA MINALDI
UNITED STATES DISTRICT COURT